UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                            )
SECURITIES AND EXCHANGE COMMISSION,   )
                                                            )
                        Plaintiff,                          )
                                                            )        Case No.
            v.                                              )
                                                            )        **JURY TRIAL DEMANDED**
HARPREET GREWAL,                                            )
                                                            )
                        Defendant.                          )
_____ )

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("the Commission") alleges:

## SUMMARY

1.        This case involves misrepresentations and a scheme to defraud investors by Harpreet Grewal ("Grewal"), who in 2014 and 2015 was the chief financial officer of Constant Contact, Inc. ("Constant Contact"), a company whose stock was registered with the Commission and publicly traded.  Constant Contact sold email marketing and other online marketing tools to customers primarily through subscription arrangements.  Grewal defrauded Constant Contact's investors concerning the number of paying customers for the company's products and services, which was a key metric disclosed by Constant Contact to its investors.

2.        As a business that sold its products mainly through subscriptions, Constant Contact's revenue growth was dependent on the company's ability to both attract new customers and retain current customers.  Each quarter, Constant Contact reported to investors information about customer growth in the quarter, information the company described as a key metric that was critical to understanding and improving the business.  In or around the second half of 2014,

Constant Contact's customer growth began to slow.  Faced with the prospect of reporting slowing customer growth, Grewal and the company engaged in a scheme to defraud investors by hiding the slowing customer growth trends they observed.  Under Grewal's leadership and direction, Constant Contact designed a program, referred to as the "Save Program," to provide free service to cancelling customers in order to postpone their cancellations from the end of one fiscal quarter into the beginning of the next.  Constant Contact and Grewal included customers who received the Save Program in "paying customer" counts reported to investors when in fact these customers had already indicated they wanted to cancel their service and, as a result, were not paying for service.

3.      In quarterly and annual reports filed with the Commission, Constant Contact reported the number of "unique paying customers" as of the end of each quarter.  In related press releases issued to investors and the general public, Constant Contact contrasted the customer count from the present quarter with that of the prior quarter.  Grewal invited investors to use the increase in the customer count from one quarter to the next, (often called "Net Adds") as a way to evaluate the company's performance.

4.      When he announced Constant Contact's financial results for the fourth quarter of fiscal year 2014 (the quarter ended December 31, 2014), Grewal touted to investors that Constant Contact was on the path to delivering long-term, sustained annual revenue growth of 20%.  Before that quarter, Constant Contact had reported 10,000 Net Adds for seven straight quarters.  Grewal and other senior management at Constant Contact saw 10,000 Net Adds as a quarterly business target, in part because sustained Net Add growth was necessary to achieve the sustained revenue growth they promised investors.

5.      Grewal spearheaded the design of the Save Program when, and because, Constant

2

Contact found itself in danger of missing its 10,000 Net Adds per quarter target in 2014. Grewal and others specifically designed the Save Program to increase quarter-end customer count reporting, and specifically targeted *only* customers who cancelled service in the last month of a quarter, such that the free month would necessarily result in their receiving service into the next quarter. In advance of reporting quarterly results to investors, Grewal knew that, without including Save Program customers in the reported totals, Constant Contact would miss its desired Net Add targets. By including Save Program customers in the publicly reported customer count, Grewal and Constant Contact reported that Constant Contact was achieving 10,000 Net Adds in the fourth quarter of 2014 (the quarter ended December 31, 2014) and the first quarter of 2015 (the quarter ended March 31, 2015) and 5,000 Net Adds in the second quarter of 2015 (the quarter ended June 30, 2015) (the "Relevant Period"). In fact, Constant Contact added only half as many customers (5,000) in the fourth quarter of 2014 and the first quarter of 2015, and no customers in the second quarter of 2015. Grewal made a series of material misstatements during this period which falsely led investors to believe that Constant Contact's customer growth was consistent with expectations and with the company's growth story.

6. The use of the Save Program, and Grewal's misleading statements about customer growth, hid from investors that the company was facing challenges in attaining its publicly-stated goal of long-term, sustained 20% annual revenue growth. In connection with Constant Contact's financial results for the fourth quarter and fiscal year 2014, Grewal stated to investors that Constant Contact was "executing on a path" to achieve its goal, while failing to tell investors that the company had actually resorted to free product giveaways in order to maintain the illusion of steady customer growth. Following the announcement of the company's fourth quarter and

3

fiscal year 2014 results, Constant Contact's stock price closed at $39.17 per share.  Just six months later, when Constant Contact had announced publicly on two occasions that its expected revenue going forward would be lower than anticipated and announced that it would not sustain Net Adds of 10,000 customers per quarter for the balance of 2015, the company's stock closed at $29.53 per share.

7.      Grewal sold 74,299 shares of Constant Contact stock for gross proceeds of $3 million near the height of the company's stock price valuation, within months of when he made misleading statements about customer growth in connection with Constant Contact's fourth quarter and fiscal year 2014 earnings announcement.

8.      By knowingly or recklessly engaging in the conduct described in this Complaint, Grewal violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5.  Grewal also violated Exchange Act Rule 13a-14 and is liable for aiding and abetting Constant Contact's violations of Exchange Act Sections 13(a) and 13(B)(2)(A) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

## JURISDICTION AND VENUE

9.      The Commission seeks a permanent injunction and disgorgement pursuant to Section 20(b) of the Securities Act [15 U.S.C. §77t(b)], and Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)].  The Commission seeks the imposition of a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

10.      The Court has jurisdiction over this action pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§77t(d), 77v(a)], and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), 78aa].

11.     Venue is proper in this District because, at all relevant times, Constant Contact maintained offices in Massachusetts and conducted business in Massachusetts, and Grewal lived in Massachusetts.  A substantial part of the actions that give rise to the Commission's claims also occurred in Massachusetts.

12.     In connection with the acts described in this Complaint, Grewal directly or indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

13.     Grewal's conduct involved fraud, deceit, or deliberate reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

14.     Unless enjoined, Grewal will continue to engage in the securities law violations alleged herein, or in similar conduct that would violate federal securities laws.

### DEFENDANT

15.     **Harpreet Grewal ("Grewal")**, age 51, served as Chief Financial Officer and Treasurer of Constant Contact from July 2010 to February 2016.  Grewal is a resident of Cambridge, Massachusetts.

### RELATED ENTITY

16.     **Constant Contact, Inc. ("Constant Contact")**, is incorporated in Delaware with a principal place of business in Waltham, Massachusetts.  On February 9, 2016, Constant Contact was acquired by Endurance International Group Holdings, Inc.  Prior to the acquisition, Constant Contact's common stock was registered with the Commission pursuant to Section 12(b) of the Exchange Act and was quoted under the symbol "CTCT" on the NASDAQ Global Select

Market.  During the relevant period, Constant Contact sold marketing solutions to small businesses principally on a subscription basis.

## STATEMENT OF FACTS

**I.      Constant Contact's Net Adds Disclosures and the Company's Growth Narrative**

17.      Constant Contact described its "unique paying customer" count to investors as a "key financial and operating metric" regularly reviewed by its management and Board of Directors.  From October 2010 through the end of the Relevant Period, Constant Contact and Grewal routinely disclosed the number of unique paying customers for Constant Contact's products and services in various annual and quarterly filings with the Commission, quarterly earnings releases (which are regular news or other releases issued by companies to announce their financial performance), public conference calls to discuss with investors the company's financial performance (commonly referred to as "earnings calls"), and investor conferences.

18.      Constant Contact first disclosed the number of unique paying customers for its products and services in connection with reporting its financial results for the third quarter of fiscal year 2010.  In an earnings call on October 28, 2010, Grewal explained that the metric was "different than customer counts you may hear from other vendors that include free subscribers or users" because Constant Contact was "only including those customers that pay a fee to Constant Contact."  On the earnings call, Grewal explained that Constant Contact would provide sufficient information for investors to calculate an approximate quarterly Net Adds number, rounded to the nearest 5,000.  Grewal explained to investors that Constant Contact's Net Adds "gives you a pretty good sense of what our performance is in any given quarter."

19.     Prior to the fourth quarter of 2014, Constant Contact reported 10,000 Net Adds in eight straight quarters, from the fourth quarter of fiscal year 2012 to the third quarter of fiscal year 2014.

20.     Constant Contact and Grewal were aware that the 10,000 Net Adds threshold was an important one for investors.  When Constant Contact missed this target and reported only 5,000 Net Adds, in connection with third quarter 2012 results, the company's stock price dropped almost 30% from $17.03 per share prior to the announcement to $11.93 per share at the close of the following business day.  In an earnings call on the day of the announcement, Constant Contact's Chief Executive Officer characterized the customer additions shortfall as a "failure in execution" which "does not set us up for the anticipated acceleration in new customer growth in the fourth quarter of this year and moving into 2013."  Stock analysts who evaluate companies as investment opportunities commented on the company's financial results, noted disappointment regarding Net Adds, and described the trend as a cause of reduced expectations for financial performance in future periods.  Grewal later expressed the opinion that Net Adds disappointment in the third quarter of 2012 "worked to . . . take our valuation down."

21.     In the Spring of 2014, Grewal touted Net Adds at an investor conference as "amazingly important" to Constant Contact's growth.  He also explained that the company "trained Wall Street to look at our business from the top line perspective through the lens of volume of customers, which is how many customers you're acquiring, how many customers do you have, how many customers do you retain[.]"

22.     On May 1, 2014, Grewal informed investors on an earnings call that Constant Contact expected to achieve 40,000 Net Adds in fiscal year 2014, further noting "we believe we are setting ourselves to deliver sustainable revenue growth north of 20% . . . "  In October 2014,

Grewal told investors during Constant Contact's third quarter 2014 earnings call that he expected "an acceleration of customer adds" and "underlying improvements in retention" would contribute to revenue growth in 2015.

## II.    In the Fall of 2014, Grewal Learned Constant Contact was Having Difficulties Achieving Net Adds Targets

23.    In early September 2014, Grewal gave a presentation to Constant Contact's Board of Directors that painted a different picture than the public statements he was making to investors about the company's prospects for growth. The presentation identified "declining trends" in Constant Contact's core email marketing business, which included declining customer additions and weakness in customer engagement.  The presentation also noted a risk that Constant Contact would miss its 10,000 Net Adds targets in the third quarter (the quarter ended September 30, 2014) and fourth quarter (the quarter ended December 31, 2014) of fiscal year 2014.

24.    Prior to the September presentation to the Board, on August 13, 2014, Grewal received a financial forecast for the third and fourth quarters of fiscal year 2014 that predicted that Constant Contact would report 0 Net Adds and 5,000 Net Adds in each quarter, respectively. By September 21, 2014, nine days before the close of the third quarter of fiscal year 2014, Grewal reported to Constant Contact's executive team that he believed the company would be 500 to 1,000 customers short of meeting the 10,000 Net Adds target for that quarter.  Grewal reported that the shortfall existed even after making a change in the customer count methodology which he anticipated would allow the company to count, for the first time, between 6,000–7,000 customers who purchased a product which had not been included in the customer count in prior disclosures.

8

**III.     Grewal Implemented the Save Program to Defer Customer Cancellations and Avoid Announcing A Failure to Meet Third Quarter 2014 Net Adds Targets**

25.     On September 22, 2014, eight days before the close of Constant Contact's third quarter of fiscal year 2014, a member of the Board of Directors emailed Grewal asking whether the company would be able to "'produce'" 10,000 Net Adds in the quarter "in keeping with expectations."  In a response email, Grewal reported that achieving 10,000 Net Adds was "tight" and that he was "trying to pull some levers" to reach the target.  Later that evening, Grewal discussed potential strategies to defer customer cancellations until after the end of the quarter with Constant Contact's Vice President of Sales and Vice President of Operations.  Constant Contact's Vice President of Operations suggested to Grewal that, by crediting rather than cancelling accounts of customers who called to cancel before the end of the quarter, the company could achieve "at least 500 saves" for quarter end.  Two days later, after the idea was further refined by Grewal and others, Constant Contact implemented the Save Program, which provided a free month of service to customers who cancelled during the remaining six days of the quarter.

26.     Grewal participated in the development and implementation of the Save Program in a fraudulent effort to avoid announcing that Constant Contact had failed to meet its 10,000 quarterly Net Adds target for the third quarter of fiscal year 2014 by including non-paying customers who had cancelled their service and were being given a free month of service.  Grewal knew that if two customers called on the second to last day of the quarter to cancel their accounts, one of whom had a bill date as of the last day of the quarter, and one of whom was scheduled to be billed a week later, only the one who was scheduled to have a cancellation date prior to the close of the quarter would receive a free month.  Grewal also received emails informing him that customers receiving a free month at the close of the quarter would be

automatically cancelled in the following quarter.  Thus, Grewal knew that the Save Program

targeted only those customers whose loss would hit Constant Contact's Net Adds numbers for

the third quarter.

27.    Grewal participated in implementing the Save Program while fully aware of the

program's potential impact on the quarterly Net Adds target.  Until the end of the quarter,

Grewal closely followed both the number of incremental Net Adds resulting from the Save

Program and the number of incremental Net Adds necessary to achieve Constant Contact's

quarterly 10,000 target.  During the final days of the third quarter of fiscal year 2014, Grewal

anticipated that the company would need to count Save Program recipients in order to meet its

Net Adds target.  During that period, he made decisions about the scope of the Save Program

offer based on the whether the affected customers would be needed to achieve the company's

10,000 Net Adds target.  For example, in desperation to get as many "saves" as possible, Grewal

and others contemplated offering a free month to former customers that had cancelled earlier in

the month by sending them emails.  But on September 30, after hearing from the finance group

that the company was trending to meet the 10,000 Net Adds target without additional initiatives,

Grewal instructed the Vice President of Operations that the Save Program offer did not need to

be emailed to those former customers.

28.    In early October 2014, when Constant Contact performed its final calculations of

its performance for the third quarter, Grewal learned that Constant Contact was able to achieve

its 10,000 Net Adds target for external reporting without including any customers whose

cancellation had been delayed by the Save Program.  A member of Constant Contact's finance

department recommended to Grewal via email that Save Program recipients not be included in

the company's internal tallies because "the likelihood is that all the cancels will hit this

upcoming month."  During the fourth quarter of fiscal year 2014, Grewal received documents

showing that, for internal tracking and forecasting purposes, Constant Contact's finance

personnel counted Save Program recipients in the third quarter of fiscal year 2014 as having

cancelled during the quarter (and not as customers as of the end of the quarter).

**IV.    Grewal and Constant Contact Used the Save Program to Avoid Announcing A Failure to Meet its 10,000 Net Adds Target in the Fourth Quarter of Fiscal Year 2014**

29.    In early October 2014, at the start of Constant Contact's fourth quarter of fiscal

year 2014, Grewal received from others at Constant Contact a Net Adds forecast for the quarter

that indicated that the company was likely to be 2,000 to 7,000 customers short of the 10,000 Net

Adds target.  By the end of October, Grewal received a forecast that projected that Constant

Contact would fall short of the 10,000 Net Adds target by approximately 5,000 customers.  Four

days later, the Vice President of Sales reported to Grewal and others that he believed Constant

Contact could achieve the 10,000 Net Adds target using "a second run of the save program."

30.    On November 6, 2014, Grewal received from the Vice President of Operations an

email that outlined instructions to be given to customer service representatives regarding the

Save Program at the end of the fourth quarter of fiscal year 2014.  The email stated "[w]e should

not see many offers until December, but we understand the urgency and that we don't want to

miss [] opportunities to defer a cancel to Q1 [the following quarter]."  The email also instructed

customer service representatives to offer a free month of service only to customers who are

cancelling with a billing date in the last month of the quarter, and only after the customer had

rejected all other retention offers.  The email included a script for customer service

representatives to use when offering the Save Program, which stated:

"As a holiday thank you for your business, we are providing you with an additional month free of charge.  You will be able to use the account completely free until January xx, 2015 at which time your account will be canceled automatically unless we hear from you letting us know you would like to keep it open.  There is no need to call us if you still wish to cancel and you can use the account for another month at no cost to you."

31.     After Constant Contact implemented the Save Program in early November 2014, Grewal got periodic reports from the Vice President of Operations and from finance personnel about the number of incremental Net Adds resulting from the Save Program and the number of incremental Net Adds necessary to achieve Constant Contact's quarterly 10,000 target.  The Vice President of Operations explained to Grewal on one occasion that the numbers she was providing were "quarter end saves – people calling to cancel with a Dec[ember] invoice."  In other words, she alerted Grewal to the fact that, just as with the first run of the Save Program, these customers would, in the ordinary course, be cancelled before the end of the quarter.

32.     With the benefit of this information, Grewal reported to Constant Contact's executive team on November 21, 2014 (one month prior to the end of the fourth quarter of fiscal year 2014) that he expected achieving the 10,000 Net Adds target for the quarter was "going to be a bit tight" even after including the Save Program customers.

33.     After the close of the fourth quarter of fiscal 2014, on January 12, 2015, a member of Constant Contact's finance team reported to Grewal via email that the company met the 10,000 Net Adds target after including the Save Program customers.  As of early January 2015, Grewal understood that, in order to avoid announcing a failure to achieve the 10,000 Net Adds target, Constant Contact had included 3,200 customers who received the Save Program, meaning customers who had called to cancel their service and were told that the cancellation would proceed in one month.  Grewal further understood that, without counting those 3,200

12

cancelling customers as "paying customers," Constant Contact would have been able to report only 5,000 Net Adds in the quarter to investors.

34.     Grewal knew that reporting 10,000 Net Adds for the fourth quarter of 2014 would mislead investors about Constant Contact's growth trends.  Grewal and others at Constant Contact used different numbers for their own internal purposes.  For example, on January 19, 2015, ten days before Constant Contact publicly announced its results for the fourth quarter of fiscal 2014, Grewal presented quarterly results internally to Constant Contact's Senior Operating Committee, a committee comprised of managers at the company.  In the presentation, he presented "actual" Net Adds for the quarter as 2,668.  Grewal highlighted for the Senior Operating Committee that the "actual" Net Adds for the fourth quarter of fiscal year 2014 were 79% lower than in fourth quarter of the prior year.  Yet Grewal and Constant Contact publicly reported 10,000 Net Adds to investors in each period.

35.     Grewal also knew that customer growth trends did not support the company's 20% revenue growth aspirations.  On December 14, 2014, Grewal sent an email to himself that stated that internal forecasts for the first quarter of 2015 indicated the company would grow revenue at only 13%, two percentage points lower than Wall Street consensus (the average of estimates made by analysts who followed the company), and he stated that he was "a bit apprehensive about the levers at our disposal to make up that size of gap."  In the email, he noted that "underlying trends" for customer growth were "not showing improvement."

36.     In or around the fourth quarter of fiscal year 2014, Grewal was informed by the Vice President of Finance that finance personnel had questioned the business value of using the Save Program and had also questioned whether customers who received the Save Program qualified under the company's operative practice for counting of "paying customers."  Grewal

13

decided to include Save Program customers in the "paying customer" count after receiving this information.

**V.    Grewal Sold Constant Contact Stock After Making Materially Misleading Statements to Constant Contact's Investors about the Company's Fourth Quarter 2014 Customer Growth**

37.    When Constant Contact publicly announced its fourth quarter and fiscal year 2014 results on January 29, 2015, the company reported 10,000 Net Adds.  Constant Contact falsely stated in its annual report on Form 10-K filed with the Commission that its customer count was comprised of "unique paying customers."   In reality, as Grewal well-knew, the customer count included approximately 3,200 Save Program recipients who were *not* paying.  Without the inclusion of customers who had called to cancel and received a free month pursuant to the Save Program, the company would have reported only 5,000 Net Adds.

38.    As the company's CFO, Grewal signed Constant Contact's annual report on Form 10-K filed with the Commission, which reported results for the fourth quarter and fiscal year 2014.  In doing so, he represented that (1) the report did not contain any materially misleading statements, (2) the report fully complied with applicable disclosure requirements, (3) the report fairly presented, in all material respects, the results of the company's operations, and (4) he had disclosed to Constant Contact's auditors and Audit Committee deficiencies in internal controls and fraud involving management or other employees who have a significant role in Constant Contact's internal control over financial reporting.  Grewal's certifications in this Form 10-K were false and misleading because he was aware that the "paying customer" count as disclosed in the filing was overstated by 5,000 as a result of counting cancelling customers who received a free month of service pursuant to the Save Program.  The 5,000 overstatement was material to investors because of its impact on Net Adds expectations – absent the overstatement, the

14

company's quarterly customer growth, as reported to investors, would have been cut in half.  The

overstatement was also material to investors because it obscured the fact that Constant Contact

faced slowing customer growth, which was inconsistent with Constant Contact's publicly

announced goals of reaching long-term, sustained 20% revenue growth.  In addition, Grewal's

certification was false because he had not disclosed to either Constant Contact's auditors or its

Audit Committee that the Save Program was designed and implemented as a ruse to create the

appearance that Constant Contact had met its quarterly Net Adds targets.

39.     Grewal made other public misstatements to investors about Constant Contact's

customer growth in the fourth quarter of 2014.  During the earnings call on January 29, 2015,

Grewal stated "[w]e have struggled in the last few years to show year-over-year increases in

customer adds, and we're very pleased with acceleration in customer adds in the back half of the

year.  We ended the year with 635,000 paying customers, representing 40,000 net new customers

in the year."  Grewal's statement about achieving 40,000 Net Adds (10,000 Net Adds each

quarter) was misleading because the Net Adds number he cited included customers who were

receiving a free month pursuant to the Save Program.  In fact, Grewal was aware that without the

Save Program, Constant Contact only achieved 35,000 Net Adds in the year and experienced a

deceleration in Net Adds in the second half of the year.

40.     Grewal conveyed optimism at other points in the fourth quarter fiscal year 2014

earnings call on January 29, 2015 without acknowledging to investors the fact that the company

had resorted to giving away free product to cancelling customers in order to create the illusion of

steady customer growth.  He misled investors about observed deceleration in customer additions

in the back half of fiscal year 2014 again when he said "[because] of the year-over-year decrease

in retention rates in the fourth quarter, we were unable to translate growth [in] gross customer

additions down to net customer additions.  However, we are starting to see the basis of an

acceleration in net customer growth, and hope to prove that out over the course of 2015."  He

also claimed the company was "executing on a path to deliver sustained revenue growth greater

than 20%" despite his own comments in an email in the middle of December 2014 that reflected

decelerating revenue growth projections.  Grewal acknowledged during the earnings call that

revenue growth would be driven "through a combination of three growth levers: new customer

additions, increased [average revenue per unique customer], and improved customer retention."

His comments were misleading because they failed to convey to investors that the Save Program

obscured declines in at least one of those levers, retention.

41.     On February 9, 2015, at an investor conference, Grewal similarly stated "I'm

seeing trends in the back half of 2014 related to growth in net adds that suggest we might be on

the path to starting to increase net adds in 2015."  Grewal's comment was misleading because it

again failed to disclose that the company's Net Adds growth had actually declined, and that this

decline was obscured by the inclusion of "customers" whose cancellations had been artificially

delayed by the Save Program.

42.     On March 4, 2015, at an investor conference, Grewal explained in response to a

question about customer retention efforts that "[w]e are just getting more intelligent about how to

control churn . . . we are really using the power of analytics to help us and predictive analytics

particularly. . . . Because none of this matters if the customer doesn't get success.  You can save

them for a month but they will leave you two months later."  Grewal's comments were

misleading because they failed to discuss that the Save Program had been a key driver for the

company's reported, and misleading, fiscal year 2014 Net Adds target.  Grewal's comments were

additionally misleading in that, by acknowledging that a program like the Save Program would

have no business utility, he obscured the fact that Constant Contact had actually been using such a program to falsely over-report its customer count.

43.     Grewal sold Constant Contact stock following the misstatements he made about fourth quarter fiscal year 2014 results.  On February 24–26, 2015 and on April 9, 2015, Grewal sold a total of 74,299 shares of Constant Contact stock for gross proceeds of more than $3 million pursuant to a 10b5-1 plan (a pre-arranged plan under an SEC rule that allows insiders of public companies to automatically sell securities on a predetermined date) enacted on November 21, 2014.  The 10b5-1 plan was enacted after Grewal learned the company would run the Save Program to meet its 10,000 Net Adds target for the fourth quarter of fiscal year 2014.

## VI.   Grewal and Constant Contact Used the Save Program to Defer Customer Cancellations in Order to Avoid Announcing A Failure to Meet its 10,000 Net Adds Target in the First Quarter of Fiscal Year 2015

44.     On January 11, 2015, Grewal received an email from Constant Contact's Vice President of Customer Operations stating that she intended to start Save Program offers on February 1, 2015, the beginning of the second month of the quarter, unless Grewal instructed otherwise.

45.     In February and March 2015, Grewal got periodic reports from the Vice President of Operations and from finance personnel about the number of incremental Net Adds resulting from the Save Program and the number of incremental Net Adds necessary to achieve Constant Contact's quarterly 10,000 target.  Grewal was aware, based on the information he received, that the Save Program was offered as it had been in the prior quarter – only to cancelling customers with an invoice date in the last month of the quarter.

46.     As of February 16, 2015, the Vice President of Sales reported to Grewal and others that "we are right on the threshold for a 10k net add quarter."  One week later, Grewal

attended a Senior Operating Committee meeting that addressed January results.  Notes from the meeting described "negative net adds" as "a significant pain point" and concluded "need higher gross adds (17-18k) to achieve desired net adds (10k)."

47.     In late March 2015, Grewal learned that there were 6,800 cancelling customers who were being included in Constant Contact's publicly announced "customer" count for the first quarter of 2015 based on their receipt of free service pursuant to the Save Program.  Based on the information he received, Grewal understood that, without counting the Save Program recipients, the company would have reported that its "paying customers" had increased by only 5,000 from the prior quarter.

48.     As in the prior quarter, Grewal understood that Constant Contact's actual customer growth numbers were not consistent with a decision to report 10,000 Net Adds in the first quarter of fiscal year 2015.  On March 22, 2015, Grewal stated in an email to Constant Contact's executive team that the company's Net Adds difficulties resulted in a $3-$4 million reduction to revenue forecasts for 2015.  One week later, Grewal stated in another email to Constant Contact's executive team that he identified "another ~$1 million headwind" to the revenue forecast and that he was "quite certain this is a continuation of the net add challenges."

**VII.    Grewal Made Materially Misleading Statements to Constant Contact's Investors about the Company's First Quarter 2015 Customer Growth**

49.     When Constant Contact announced its first quarter 2015 results on April 30, 2015, the company reported 10,000 Net Adds.  In actuality, as Grewal understood, without the inclusion of the Save Program customers, the company would have reported only 5,000 Net Adds.

50.     Grewal signed Constant Contact's Form 10-Q filed with the Commission, which reported results for the first quarter fiscal year 2015.  In doing so, he represented that (1) the report did not contain any materially misleading statements, (2) the report fully complied with applicable disclosure requirements, (3) the report fairly presented, in all material respects, the results of the company's operations, and (4) he had disclosed to Constant Contact's auditors and Audit Committee deficiencies in internal controls and fraud involving management or other employees who have a significant role in Constant Contact's internal control over financial reporting.  Grewal's certifications in this Form 10-Q were false because he was aware that the "paying customer" count as disclosed in the filing was overstated by 5,000 as a result of counting cancelling customers who received a free month of service pursuant to the Save Program.  The 5,000 overstatement was material to investors because of its impact on Net Add expectations – absent the overstatement, the company's quarterly customer growth as reported to investors would have been cut in half.  In addition, Grewal's certification was false because he had not disclosed to either Constant Contact's auditors or its Audit Committee that the Save Program was designed and implemented as a ruse to hit quarterly Net Adds targets.

51.     During the earnings call on April 30, 2015, Grewal informed investors that the company was reducing its revenue guidance for the year because Net Adds fell short of internal expectations in the quarter.  Grewal further explained that Constant Contact had forecasted Net Adds growth of greater than 10,000, but had been hindered in achieving that goal by credit card cancellations.  Grewal's comments were misleading in that, the company had not simply failed to meet a goal of more than 10,000 Net Adds, it had only "met" the 10,000 net adds figure by including customers who were temporarily receiving free service pursuant to the Save Program.

19

Grewal failed to inform investors that, without providing free product to cancelling customers, Constant Contact would have reported only 5,000 Net Adds as customer growth in the quarter.

52.     Even the misleading report of 10,000 Net Adds, together with Grewal's proffered explanation that the company had been hampered by credit card cancellations, proved insufficient to re-assure Constant Contact's investors.  The company's reduction of revenue guidance for the rest of the year prompted Constant Contact's stock price to decline 21% from $34.85 at the close on April 30, 2015 to $27.51 at the close on May 1, 2015.

53.     Grewal continued to make misleading statements about customer growth in subsequent investor conferences regarding first quarter fiscal year 2015 results.  He reported Constant Contact's false customer count at investor conferences on May 5, 2015, May 13, 2015, and June 30, 2015.  Each time, his comments regarding Net Adds challenges were misleading in that they failed to disclose that the company's quarterly Net Adds were materially overstated by including customers who had received a free month after calling to cancel.

**VIII.   Grewal and Constant Contact Used the Save Program to Defer Customer Cancellations in Order to Avoid Announcing A Failure to Meet 5,000 Net Adds in the Second Quarter of Fiscal Year 2015**

54.     On May 11, 2015, Grewal and others were informed by email from the Vice President of Customer Operations that the Save Program was instituted again for the second quarter of fiscal year 2015 (the quarter ended June 30, 2015) at the start of May 2015 (the second month of the quarter).

55.     In May and June 2015, Grewal received periodic reports from the Vice President of Operations and from finance personnel about the number of incremental Net Adds resulting from the Save Program and the number of incremental Net Adds necessary to achieve 5,000 Net Adds.

56.     On July 20, 2015, three days before Constant Contact announced its quarterly results for the second quarter of fiscal year 2015, Grewal presented quarterly results to Constant Contact's Senior Operating Committee.  In the presentation, he presented "actual" Net Adds for the quarter as 1,554, down from 6,664 Net Adds in the second quarter of the prior year.  Based on the information he received, Grewal understood that, without counting the Save Program recipients, the company would have reported that its "paying customers" had not increased from the prior quarter.

## IX.     Grewal Made Materially Misleading Statements to Constant Contact's Investors about the Company's Second Quarter 2015 Customer Growth

57.     When Constant Contact publicly announced its second quarter 2015 results on July 23, 2015, the company reported 5,000 Net Adds.  In fact, without the inclusion of the Save Program customers, the company would have reported zero Net Adds.

58.     Grewal signed Constant Contact's quarterly report on Form 10-Q filed with the Commission, which reported results for the second quarter fiscal year 2015.  In doing so, he represented that (1) the report did not contain any materially misleading statements, (2) the report fully complied with applicable disclosure requirements, (3) the report fairly presented, in all material respects, the results of the company's operations, and (4) he had disclosed to Constant Contact's auditors and Audit Committee deficiencies in internal controls and fraud involving management or other employees who have a significant role in Constant Contact's internal control over financial reporting.  Grewal's certifications in this Form 10-Q were false because he was aware that the "paying customer" count as disclosed in the filing was overstated by 5,000 as a result of counting cancelling customers who received a free month of service pursuant to the Save Program.  The 5,000 overstatement was material to investors because of its

21

impact on Net Add expectations – absent the overstatement, the company's quarterly customer growth as reported to investors would have been eliminated.  In addition, Grewal's certification was false because he had not disclosed to either Constant Contact's auditors or its Audit Committee that the Save Program was designed and implemented as a ruse to hit quarterly Net Add targets.

59.     During Constant Contact's earnings call on July 23, 2015, Grewal stated that achieving 5,000 Net Adds in the quarter was "within our range of expectations, but at the lower end of our expectations."  Grewal falsely stated on this call that Constant Contact achieved 15,000 Net Adds during the first six months of the year.  In fact, Grewal was aware that without the Save Program, Constant Contact could not report 5,000 Net Adds in the quarter or 15,000 Net Adds in the first six months of the year.  Grewal's partial disclosure of Net Add challenges, which he described as a "headwind for the back half of 2015," and the company's further reduction of fiscal year 2015 revenue guidance prompted Constant Contact's stock price to decline 11% from $29.53 at the close on July 23, 2015 to $26.18 at the close on July 24, 2015.

## FIRST CLAIM
### Fraud in the Purchase or Sale of Securities in Violation of
### Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

60.     The Commission repeats and incorporates by reference the allegations in paragraphs 1–59 above as if set forth fully herein.

61.     Grewal engaged in a fraudulent course of conduct that included making material misrepresentations and omissions regarding Constant Contact's customer growth.

62.     By engaging in the conduct described above, Grewal, directly or indirectly, acting knowingly or recklessly, by the use of means or instrumentalities of interstate commerce or of

the mails, in connection with the purchase or sale of securities, has employed a device, scheme or artifice to defraud; made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices or courses of business which operate as a fraud or deceit upon certain persons.

63.     By reason of the foregoing, Grewal violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## SECOND CLAIM
### Fraud in the Offer or Sale of Securities in
### Violation of Section 17(a) of the Securities Act

64.     The Commission repeats and incorporates by reference the allegations in paragraphs 1–59 above as if set forth fully herein.

65.     Grewal engaged in a fraudulent course of conduct that included making material misrepresentations and omissions regarding Constant Contact's customer growth.

66.     By engaging in the conduct described above, Grewal, directly and indirectly, acting knowingly, recklessly, or negligently, in the offer or sale of securities by the use of means or instrumentalities of interstate commerce or the mails, has employed a device, scheme or artifice to defraud; obtained money or property by means of untrue statements of material fact or the omission of a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; and engaged in transactions, practices or courses of business which operate as a fraud or deceit upon purchasers of the securities.

67.     By reason of the foregoing, Grewal violated Section 17(a) of the Securities Act

[15 U.S.C. §77q(a)].

### THIRD CLAIM
### Violations of Exchange Act Rule 13a-14

68.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1–59 above as if set forth fully herein.

69.     As the Chief Financial Officer of Constant Contact, Grewal was required to and

did sign and certify Constant Contact's annual report on Form 10-K for 2014 and its quarterly

reports on Form 10-Q for the fiscal quarters ending March 31, 2015 and June 30, 2015.  Among

other things, Grewal certified that the reports did not contain any untrue statement of material

fact or omit to state a material fact necessary to make the statements made not misleading.  These

certifications were materially false.

70.     By reason of the foregoing, Grewal violated Exchange Act Rule 13a-14 [17

C.F.R. § 240.131-14].

### FOURTH CLAIM
### Aiding and Abetting Violations of Section 13 of the Exchange Act and
### Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13

71.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1–59 above as if set forth fully herein.

72.     Section 13(a) of the Exchange Act and Rules 13a-1, 13a-11, and 13a-13

thereunder require issuers of registered securities to file with the Commission factually accurate

annual and quarterly reports (Form 10-K and Form 10-Q) and certain current information with

the Commission (Form 8-K).  Rule 12b-20 further provides that, in addition to the information

expressly required to be included in a statement or report, there shall be added such further

material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading.  Constant Contact violated Section 13(a) of the Exchange Act and these related rules by filing inaccurate filings which misstated its paying customer count and omitted to state information about the Save Program which was necessary to make the statements made not misleading.

73.     Section 13(b)(2)(A) of the Exchange Act requires every issuer of a security to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer."  Constant Contact failed to keep accurate books and records in that it failed to accurately record the number of subscribers in its internal books and records and filed inaccurate quarterly and annual reports.

74.     Grewal knowingly or recklessly provided substantial assistance to Constant Contact's violations of Section 13(a).  By reason of the foregoing, Grewal aided and abetted Constant Contact's violations of Section 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder in violation of Section 15(b) of the Securities Act [15 U.S.C. §77o(b)] and Section 20(e) of the Exchange Act [15 U.S.C. §78t(e)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that this Court:

A.     Enter a permanent injunction restraining Grewal and his agents, servants, employees and attorneys and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect;

B.     Require Grewal to disgorge his ill-gotten gains, plus pre-judgment interest;

C.     Require Grewal to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

D.     Impose an officer and director bar against Grewal pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] ;

E.     Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.     Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION
By its attorneys,

*/s/ Michael J. Vito*
Michael J. Vito (BBO No. 675524)
David M. Scheffler (BBO No. 670324)
Rachel E. Hershfang (BBO No. 631898)
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 24th Floor
Boston, MA  02110
(617) 573-4581 (Vito direct)
(617) 573-4590 (fax)
vitom@sec.gov (Vito email)

DATED: August 21, 2018